CHARLES D. BONANNO LINEN
SERVICE, INC., et al.,
Plaintiffs, Appellees,

v.

William J. McCARTHY, et al.,
Defendants, Appellants.

No. 82–1755.

United States Court of Appeals,
First Circuit.

Argued Feb. 3, 1983.

Decided May 9, 1983.

As Modified on Denial of Rehearing and
Rehearing En Banc June 1, 1983.

James T. Grady, Boston, Mass., with whom Gabriel O. Dumont, Jr. and Grady, Dumont & Dwyer, Boston, Mass., were on brief, for defendants, appellants.

Howard I. Wilgoren, Boston, Mass., with whom Lepie, Coven & Wilgoren, Boston, Mass., was on brief, for Charles D. Bonanno Linen Service, Inc.

Before BOWNES and BREYER, Circuit Judges, and WYZANSKI,* Senior District Judge.

BREYER, Circuit Judge.

The district court awarded Bonanno Linen Service compensatory damages on a state law tort claim against Teamsters Union Local 25 and several individual Local members. The Local and the individual defendants appeal, raising several jurisdic-

---

* Of the District of Massachusetts, sitting by designation.

tional questions and also attacking the award on the merits. We agree with the jurisdictional argument of the *individual* defendants and vacate the judgment against them. As to all other matters, we affirm the judgment of the district court.

I

This case began in 1975 in the midst of a labor dispute between Bonanno, several other linen companies and the defendants. The companies brought suit in state court, alleging that the Local and some of its members had engaged in "numerous illegal acts of violence" and "threats of violence toward both Plaintiffs' property and employees, and toward third parties trying to do business with Plaintiffs." They sought an injunction and damages.

A few days after the suit was filed, all of the defendants petitioned for its removal to the Massachusetts federal district court. In their petition, the defendants stated that the plaintiffs' complaint in part alleged a violation of a federal law, the Labor-Management Relations Act (LMRA, or Taft-Hartley Act) § 303, 29 U.S.C. § 187, which grants relief to those harmed by an illegal secondary boycott. *See* 29 U.S.C. § 158(b)(4).

The companies did not oppose the removal. Rather, they asked for a federal injunction. They obtained a temporary restraining order prohibiting further violence. *See Charles D. Bonanno Linen Serv., Inc. v. McCarthy*, 532 F.2d 189 (1st Cir.1976). In April 1976, all of the companies but Bonanno voluntarily dismissed their claims. The case then lay dormant until 1979, when Bonanno announced its intention to proceed with its damage claim, once the National Labor Relations Board resolved a related unfair labor practice charge. *See NLRB v. Charles D. Bonanno Linen Serv., Inc.*, 630 F.2d 25 (1st Cir.1980), *aff'd*, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982).

In April 1980, the Local moved to remand the case to the state court, claiming lack of federal jurisdiction. The district court denied the motion in September. One year later, the individual defendants made a similar motion, which was quickly denied. Trial began on September 24, 1981. It focused almost exclusively on the state claims. In fact, the district court found for defendants on the federal secondary boycott claim, but it found for the plaintiffs on the state tort claims against both the Local and three individual members. The court ordered the defendants, who were held jointly and severally liable, to reimburse Bonanno for its expenses in protecting its employees, to pay the medical expenses of an injured employee, and to pay the cost of certain other repairs. The court also awarded prejudgment interest from the date the original action was filed.

II

a. We turn first to a jurisdictional problem which this court itself raised at oral argument. We noted that this case was removed on the ground that Bonanno asserted a claim arising under federal law. *See* 28 U.S.C. § 1441. We also pointed to the case law requiring that the elements of the federal claim appear on the face of the state court complaint, without reference to other documents, such as the removal petition or the answer. *E.g., Phillips Petroleum Co. v. Texaco, Inc.*, 415 U.S. 125, 127–28, 94 S.Ct. 1002, 1003–1004, 39 L.Ed.2d 209 (1974); *Gully v. First National Bank*, 299 U.S. 109, 113, 57 S.Ct. 96, 98, 81 L.Ed. 70 (1936); *Brough v. United Steelworkers of America*, 437 F.2d 748, 749 (1st Cir.1971). And we asked where, on the face of the state complaint, we could find the necessary "interstate commerce" allegations, namely that both the secondary boycott's ultimate target (Bonanno) and its innocent targets were in an "industry affecting [interstate] commerce." 29 U.S.C. §§ 158(b)(4), 187.

Given the factual likelihood that in most cases what affects the innocent target will affect the ultimate target, and given Congress' intent in the Taft-Hartley Act to exercise its constitutionally-granted commerce power broadly, *Groneman v. International Bhd. of Elec. Workers*, 177 F.2d 995, 997 (10th Cir.1949); *cf. NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct.

615, 81 L.Ed. 893 (1937), an allegation that *Bonanno* is "in an industry affecting [interstate] commerce" is sufficient. We are willing, for removal purposes, to presume this to be an adequate allegation of the rest. *See Herbert Burman, Inc. v. Local 3, Int'l Bhd. of Elec. Workers,* 214 F.Supp. 353 (S.D.N.Y.1963). *Cf. Tucci v. International Union of Operating Engineers,* 316 F.Supp. 1127 (W.D.Pa.1970). *See also Heart of Atlanta Motel v. United States,* 379 U.S. 241 (1964).

We reach this result without holding, as some courts have done, that one may look outside the state complaint to the removal petition for matters related to parties' "status" (such as this type of jurisdictional "commerce" nexus). *E.g., Hayes v. National Con-Serv, Inc.,* 523 F.Supp. 1034, 1037 (D.Md.1981); *Ulichny v. General Electric Co.,* 309 F.Supp. 437, 440 (N.D.N.Y.1970); *Geo. D. Roper Corp. v. Local Union No. 16,* 279 F.Supp. 717 (S.D.Ohio 1968); *Fay v. American Cystoscope Makers, Inc.,* 98 F.Supp. 278, 280 (S.D.N.Y.1951); *see* Wright, Miller & Cooper, *Federal Practice & Procedure* § 3722 at 561–64, § 3734 at 736 (1976). *But see La Chemise LaCoste v. Alligator Co.,* 506 F.2d 339, 344–45 (3d Cir. 1974), *cert. denied,* 421 U.S. 937, 95 S.Ct. 1666, 44 L.Ed.2d 94 (1975). Nor need we take "judicial notice" of the uncontested fact (as mentioned in the removal petition) that interstate commerce is here involved. *Cf. Lang v. American Motors Corp.,* 254 F.Supp. 892 (E.D.Wis.1966) ("judicial notice" that American Motors is in an industry affecting commerce). We need only engage in a little statutory logic.

The state complaint alleges that the parties held "four meetings with the Federal Mediation and Conciliation Service." This federal service is available by statute only "in any industry affecting [interstate] commerce" where the dispute "threatens to cause a substantial interruption of commerce." 29 U.S.C. § 173(b). Thus, the necessary jurisdictional impact is ascertainable from the face of the complaint (without looking to the removal petition), even though the words "interstate commerce" do not themselves appear in the complaint.

*See Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (complaint alleging impact on out-of-state purchases, revenues, and payments sufficient to establish jurisdiction). We see no reason to require more than this technical response to this technical jurisdictional matter. *Cf. Sheeran v. General Electric Co.,* 593 F.2d 93, 96 (9th Cir.) (employee's complaint did not refer to the collective bargaining agreement, but did refer to a pension contract which was an integral part of that agreement), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979).

b. The Local argues that the plaintiff's assertion of a federal claim was inadequate for another reason, namely that the state complaint failed to set out the substantive elements of a Taft-Hartley § 303 violation. The district court disagreed with the Local, and so do we.

■ The issue is whether the state complaint set out a "substantial" Taft-Hartley claim. If so, the federal court had discretionary power to hear a pendent state claim linked to the federal claim by a "common nucleus of operative fact," *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The Supreme Court has made clear that "substantial" in this context means no more than not "so insubstantial, implausible, foreclosed by prior decisions . . . or otherwise completely devoid of merit as not to involve a federal controversy . . . ." *Hagans v. Lavine,* 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974); *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 776, 39 L.Ed.2d 73 (1974); *accord, Levering & Garrigues Co. v. Morrin,* 289 U.S. 103, 105–06, 53 S.Ct. 549, 550, 77 L.Ed. 1062 (1933). The language of the state complaint—to which we look to determine the court's power, *Gibbs,* 383 U.S. at 727, 86 S.Ct. at 1139—meets this test.

The Taft-Hartley Act provides for a federal cause of action against labor organizations which engage in activity prohibited by § 8(b)(4), which makes it illegal

to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is . . .

(B) forcing or requiring any person to cease . . . doing business with any other person . . . *Provided,* that nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

.     .     .     .     .

*Provided,* that nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer . . . if the employees of such employer are engaged in a strike . . . .

29 U.S.C. § 158(b)(4)(ii). In enacting this language, Congress sought to prevent all "labor efforts to draw in neutral employers through pressure calculated to induce them to cease doing business with the primary employer." *National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 624, 87 S.Ct. 1250, 1258, 18 L.Ed.2d 357 (1967); *see Local 761, Int'l Union of Elec. Workers v. NLRB,* 366 U.S. 667, 673–74, 81 S.Ct. 1285, 1289–90, 6 L.Ed.2d 592 (1961). And, in interpreting the Act, the Supreme Court has written that a union may not, for example,

exercise coercive pressure upon [complainant's] customers, . . . in order to cause them to withhold or withdraw patronage from complainant through fear of loss or damage to themselves should they deal with it.

*National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. at 621–22, 87 S.Ct. at 1256 (quoting *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 466, 41 S.Ct. 172, 176, 65 L.Ed. 349 (1921)).

The plaintiff's state complaint, in relevant part, fits within the Act's prohibitions. It alleges that

(f) The valve of an oil truck was cracked open while parked at the Roxbury place of business of the Plaintiff, Standard, thereby causing approximately eight hundred gallons of heavy fuel oil to spill onto said Plaintiff's premises.

.     .     .     .     .

(h) Various third parties doing business with Plaintiffs have been threatened with physical violence by pickets identified as . . . members of Local 25.

And the complaint concludes that

By reason of . . . the acts of violence and threats of violence directed toward Plaintiffs' property and employees and against third parties doing business with Plaintiffs, Defendants have wilfully and intentionally attempted . . . (b) to interfere with the shipment and/or receipt of goods by Plaintiffs. As a result of the foregoing . . . certain suppliers of the Plaintiffs have refused to deliver supplies.

These allegations amount to a claim that the defendants tried to "threaten, coerce or restrain" third parties, to induce them "to cease doing business with" the plaintiffs.

The Union points to the provisos in § 8(b)(4). The first states that § 8(b)(4) does not "make unlawful, where not otherwise unlawful, any primary strike or primary picketing." The second specifies that lawful picketing is not made unlawful when third persons choose to honor the picket lines. The mere existence of picketing, however, does not automatically render all union activity lawful. *See United Steelworkers v. NLRB,* 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964); *International Union of Elec. Workers v. NLRB, supra; NLRB v. International Rice Milling Co.,* 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277 (1951). Where *an object* of the union's activity is to coerce third persons, it can fall within the prohibitions of § 8(b)(4), depending on the precise nature of the picketing and the intent of the pickets. *See, e.g., NLRB v. Enterprise Ass'n of Pipefitters, Local 638,* 429 U.S. 507, 510 (1977); *NLRB v. Denver Building Council,* 341 U.S. 675, 689 (1951); *United Scenic Artists, Local 829 v. NLRB,* 655 F.2d 1267, 1269–70 (D.C.Cir.1981); *Texas Distributors, Inc. v. Local Union No. 100,* 598 F.2d 393, 400 (5th Cir.1979); *Iodice v. Calabrese,* 512 F.2d 383, 388 (2d Cir.1975). Here, Bonanno has alleged that the Union

intended to coerce third persons into ceasing to do business with it, and it has alleged damage to the property of third persons. The determination of whether certain activity is primary or secondary can often be made only after exploration of the facts. *See International Union of Elec. Workers v. NLRB*, 366 U.S. at 673–74, 81 S.Ct. at 1289–90. Interpreting the pleadings liberally, *see* Fed.R.Civ.P. 8(f), we believe they allege conduct which could fall within the prohibitions of § 8(b)(4). *See, e.g., NLRB v. Servette*, 377 U.S. 46, 52–54 (1964). We note that appellants themselves believed as much when they asked for removal over seven years (and many judicial proceedings) ago. All this is only to say that Bonanno stated a claim, not that it could prove a violation of the Act (indeed, it failed to do so). But, since Bonanno alleged facts sufficient to present a federal question, the district court had the *power* to hear the case.

▪ The Local's arguments are, for the most part, relevant not to the issue of judicial "power," but to the question of district court "discretion." *See United Mineworkers v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139; *Ortiz v. United States*, 595 F.2d 65, 68–69 (1st Cir.1979). Thus, the fact that Bonanno did not pursue the Taft-Hartley claim vigorously in federal court—it conducted little discovery, and apparently presented no evidence at trial—weighs in favor of dismissal of the pendent state claim. The exercise of discretion to hear the state claim, however, is governed by "considerations of judicial economy, convenience, and fairness to litigants." *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 627, 94 S.Ct. 1323, 1336, 39 L.Ed.2d 630 (1974); *United Mineworkers v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. And, there are forceful considerations of this sort that cut the other way.

▪ For one thing, it was the *Local itself* that removed the action from state to federal court in the first place. As the Sixth Circuit remarked in a similar context,

Not only did the union not contest the jurisdiction of the District Court, *the case was removed from the state court upon* the union's motion. Given the expenditure of judicial time and energy on this case, and given the common nucleus of operative fact, we cannot say that the exercise of pendent jurisdiction by the District Court was an abuse of its discretion.

*Kayser-Roth Corp. v. Textile Workers Union of America*, 479 F.2d 524, 526 (6th Cir.) (emphasis in original), *cert. denied*, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973); *accord, Federal Prescription Service, Inc. v. Amalgamated Meat Cutters*, 527 F.2d 269, 274 (8th Cir.1975). Similarly here, when the Union moved for a remand, the case had been pending in federal court for five years and had already been appealed to this court once. For another thing, there is no indication that the plaintiffs lacked good faith in making their initial Taft-Hartley allegations. Under these circumstances, we find no abuse of the trial court's discretion in refusing to remand. *See Rosado v. Wyman*, 397 U.S. 397, 403–05, 90 S.Ct. 1207, 1213–14, 25 L.Ed.2d 442 (1970).

### III

▪ We turn to a more difficult jurisdictional question raised by the individual defendants—the "pendent parties." Bonanno does not assert any *federal* claim against these parties. Bonanno's state claim against them was removed from the state court, along with the federal and state claims against the Local, on the theory that the state claim against the individuals was "pendent" to the federal claim against the Local. *See Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). The individuals now claim that the federal court lacked jurisdiction to hear Bonanno's state claim against them. We agree.

The jurisdictional defect is not one of constitutional power. The grant of judicial power contained in Article III, Section 2, is related to the nature of the *case,* not the nature of each individual *claim* ("The judicial Power shall extend to all Cases, . . . .").

[I]f, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily

be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

*United Mine Workers v. Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138 (emphasis in original). The claims against the individuals here are so closely related to both federal and state claims against the Local that we are willing to assume, constitutionally speaking, that "one judicial proceeding" would be appropriate.

Nonetheless, Article III also provides that the judicial power "shall be vested ... in such inferior courts as the *Congress* may ... establish." Thus, we must ask whether Congress has vested in the federal courts the power to hear Bonanno's claims against the individual defendants. *Aldinger v. Howard, supra.* We find it has not.

In *Aldinger* the Supreme Court developed a rule of statutory construction aimed at deciding whether Congress, in a jurisdictional statute, intended to open the federal courts to particular state law claims against particular "pendent parties." The Court held that we should look at the pendent parties, and ask, "Did Congress intend this type of party to be the subject of this type of federal action?" If not, it is likely that Congress "expressly or by implication negated" jurisdiction to hear closely related state law claims against that "pendent party" as well. 427 U.S. at 18, 96 S.Ct. at 2422; *see Federal Deposit Ins. Corp. v. Otero,* 598 F.2d 627, 631 (1st Cir.1979).

The *Aldinger* plaintiff brought a federal civil rights action under 42 U.S.C. § 1983 in federal court against county officials and the county. She asserted federal jurisdiction under 28 U.S.C. § 1343, a special statute giving federal district courts "original jurisdiction of any civil action authorized by law to be commenced ... to redress" a § 1983 violation. She also brought related state claims against all of the defendants. At that time (prior to *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)), the courts believed that counties were not "persons" within the meaning of § 1983, and so the district court

dismissed the federal claim against the county. It then dismissed the *state* law claim against the county as well, on the theory that the federal court lacked the power to make the county a "pendent party" for purposes of hearing the state claims against it. The Supreme Court affirmed, stating that

> [p]arties such as counties, whom Congress *excluded* from liability in § 1983, and therefore by reference in the grant of jurisdiction under § 1343(3), can argue with a great deal of force that the scope of that "civil action" over which the district courts have been given statutory jurisdiction should not be so broadly read as to bring them *back* within that power merely because the facts also give rise to an ordinary civil action against them under state law. In short, as against a plaintiff's claim of *additional* power over a "pendent party," the reach of the statute conferring jurisdiction should be construed in light of the scope of the cause of action as to which the federal judicial power *has* been extended by Congress.

427 U.S. at 17, 96 S.Ct. at 2421.

*Aldinger* would seem to require dismissal of the state claims against the individual pendent parties here, for the jurisdictional picture is very similar. The parties have relied upon § 303 of the Taft-Hartley Act, 29 U.S.C. § 187, which provides that

> (a) It shall be unlawful ... for any labor organization to engage in any activity or conduct defined as an unfair labor practice in Section 158(b)(4) of this title.
> (b) Whoever shall be injured in his business or property by reason [of] any violation of subsection (a) of this section may sue therefor in any district court of the United States ..., or in any other court having jurisdiction of the parties ....

The district court noted that the language of the jurisdictional subsection (b), through its reference to subsection (a), applies only to suits against labor organizations, not to suits against individuals. But, it concluded that "nothing in the statute suggests that Congress intended otherwise to limit a federal district court's power to decide closely

related claims by the same plaintiff against parties who are not labor organizations."

The legislative history of § 303, however, reveals the contrary, namely a clear legislative intent to immunize individuals. *Cf. Complete Auto Transit, Inc. v. Reis,* 451 U.S. 401, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981). When Senator Taft originally introduced the Taft-Hartley Amendments in the Senate, § 303 contained language that applied to individuals as well as unions. Other Senators strongly objected, pointing out that, as drafted, § 303 might resurrect the *Danbury Hatters* case, where individual union members were held liable for union activities. 93 Cong.Rec. 4839, *quoted in Complete Auto Transit,* 451 U.S. at 413, 101 S.Ct. at 1843. In response to these fears of "mass suits against employees," 93 Cong. Rec. 4839 (remarks of Senator Morse), *quoted in Complete Auto Transit,* 451 U.S. at 413, 101 S.Ct. at 1843, Senator Taft deleted the "individual liability" language and substituted the current language, so that "the action will be open only [to suits] against labor organizations," and not against individuals. 93 Cong.Rec. 4841 (remarks of Senator Taft), *quoted in Complete Auto Transit,* 451 U.S. at 414, 101 S.Ct. at 1843–44. In finally enacting the law, Congress adopted the new Senate language, expressly declining to accept House language that would have made the individuals also liable. *Complete Auto Transit,* 451 U.S. at 414–15, 101 S.Ct. at 1843–44.

There is thus more, not less, reason here than in *Aldinger* to find that Congress "by implication" has "negated" pendent party jurisdiction over this related state law claim. In *Aldinger* the language of the jurisdictional statute (§ 1343(3)) was broader than § 303(b); the "excluded" pendent claim was less clearly outside the language of the jurisdictional statute, *cf. Monell v. Dept. of Social Services, supra,* (holding that local governments *are* "persons" subject to § 1983 liability); and the legislative history less clearly showed an intent to exclude. In sum, given *Aldinger,* § 303(b) cannot be interpreted to allow federal court jurisdiction over claims against individuals who are parties only to a related state claim.

We are aware of no other basis for jurisdiction. The Local has not itself sued the individuals for reimbursement, so they are not third party defendants, and no issue of ancillary jurisdiction arises. (And, in light of *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978), Bonanno probably could not sue the individuals directly even if they were third party defendants.) Bonanno has alleged neither diversity jurisdiction, 28 U.S.C. § 1332, nor "arising under" jurisdiction, 28 U.S.C. § 1331. In any event, we assume that the Supreme Court intends us to read § 1331 in light of the pendent party limitations inferable from § 303(b), for otherwise *Aldinger* would seem meaningless.

*Aldinger* is not quite sufficient to dispose of the matter, however, for unlike *Aldinger,* this case involves *removal.* Thus, we must ask whether the removal statute, 28 U.S.C. § 1441, provides a basis for jurisdiction which otherwise would be lacking. The relevant portions of that statute read as follows:

(b) Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. . . .

(c) Whenever a separate and independent claim or cause of action, which would be removable if sued upon alone, is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters not otherwise within its original jurisdiction.

Subsection (b) allows removal only of a case which plaintiff might have brought in federal court directly; thus, it provides no additional basis for jurisdiction. Subsection (c), however, allows a federal court to take jurisdiction of "separate and independent" causes of action that it might not otherwise

have statutory authority to hear. *See, e.g., American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951); *Charles Dowd Box Co. v. Fireman's Fund Ins. Co.,* 303 F.2d 57 (1st Cir.1962); *H.A. Lott, Inc. v. Hoisting & Portable Engineers Local No. 450,* 222 F.Supp. 993 (S.D.Tex. 1963). The question is whether that subsection helps Bonanno, and the answer is that it does not. Under the test of *American Fire & Casualty v. Finn, supra,* the state claim against the individuals is not "separate and independent" from the other claims in the case; it is too closely related to those claims to satisfy *Finn's* requirements.

To understand this conclusion, we must begin with the commentators' suggestions that § 1441(c) as a matter of logic *ought* to help Bonanno in a case like this one. Both Moore's treatise, and that of Wright, Miller & Cooper, suggest that when a defendant removes an "arising under" case, any state claims involved are either sufficiently closely related to the federal claims to be considered "pendent" (and thus removable under § 1441(b)), or they are sufficiently unrelated to be considered "separate and independent" (and thus removable under § 1441(c)). 1A J. Moore, *Federal Practice* ¶ 0.163[4.5] at 271 (2d ed. 1982); Wright, Miller & Cooper, *Federal Practice and Procedure* § 3724 at 649 (1976). In either event, the federal court has the *statutory power* to hear them, though, of course, in its discretion it can remand them to state court. What sense does it make, after all, to have a *tertium quid* of certain state claims—those too distant to be pendent, too close to be "separate and independent"— that alone, in an "arising under" case, the federal court would have no statutory power to hear? However, the history of § 1441(c), taken together with *Aldinger,* suggests that this middle category of cases does exist, and that this case falls within that category.

At first reading, § 1441(c) seems bizarre, at least as applied to "arising under" cases. It says that the more *un*related a state claim is to a federal claim, the more likely it is that removal is appropriate. But, this anomaly arises from history and, in particular, from the fact that § 1441(c) was written with *diversity* cases in mind. Before 1875, a plaintiff seeking to sue both an out-of-state defendant and an in-state defendant in federal court could not do so; there was no federal diversity jurisdiction because of a lack of *complete* diversity. *See Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). If he sued them in state court, however, federal jurisdictional law then allowed the out-of-state defendant to remove his portion of the case to federal court, provided that the claim against him was "separable" from the claim against the in-state defendant. *See* the Separable Controversy Act of 1866, 14 Stat. 306 (1866). The theory was that the defendant should not lose the protection of diversity jurisdiction merely because the plaintiff chose to join him with an in-state defendant. *Barney v. Latham,* 103 U.S. 205, 210, 26 L.Ed. 514 (1881).

In 1875, Congress passed a statute which became the former 28 U.S.C. § 71. It read

> And when in any suit mentioned in this section there shall be a controversy which is wholly between citizens of different States, and which can be fully determined as between them, then either one or more of the defendants actually interested in such controversy may remove said suit into the district court of the United States for the proper district.

This statute applied only in *diversity* cases. As interpreted by the courts this statute allowed a defendant to remove a case—indeed the *entire* case with its several defendants—where there was a "separable controversy." *Barney v. Latham, supra.* In other words, where there was a "separable controversy," the out-of-state defendant could remove, and the in-state defendant could tag along. The courts also made other complicated distinctions, interpreting the statute liberally to allow removal in a wide variety of cases. *See, e.g.,* Cohen, *Problems in the Removal of a "Separate and Independent Claim or Cause of Action,"* 46 Minn.L. Rev. 1 (1961).

As part of the 1948 Revision of the Judicial Code, Congress replaced this statute with § 1441(c). The Revisers tried to simplify the test for removal. *See* Revisions of Titles 18 and 28 of the United States Code: Hearings on H.R. 2055 Before Subcommittee No. 1 of the House Judiciary Committee, 80th Cong., 1st Sess. 29 (1947) (statement of J. Moore). And, they intended to *limit* the range of cases that diversity defendants could remove. They did this, in part, by replacing the "separable controversy" test with the words "separate and independent claim or cause of action." Insofar as diversity cases were concerned, this formula *did* make fewer cases removable. *See* 1A J. Moore, *supra,* ¶ 0.163[4.–1]; Cohen, *supra,* at 18–19. Because of the "complete diversity" requirement, if an out-of-state defendant (linked to an in-state defendant) could not satisfy the "separate and independent" test, the case could not be removed. *American Fire & Casualty Co. v. Finn, supra.*

The 1948 Revisers, however, also omitted the diversity language of § 1441(c)'s predecessors; the section thereby applied to "arising under" cases as well. And, as applied to those cases, the new stricter test did *not* stop cases from being removed. Since there is no equivalent in an "arising under" case to the "complete diversity" requirement, "arising under" actions can be removed from state court whether or not other state claims or defendants are attached. Thus, the only effect of § 1441(c) is sometimes to *expand* the scope of removal by allowing the "separate and independent" state claim defendant to tag along. There is no indication that the revisers foresaw this result, *see* Cohen, *supra,* at 31–32, and commentators have questioned its constitutionality, *e.g.,* Lewin, *The Federal Courts' Hospitable Back Door,* 66 Harv.L. Rev. 423 (1953); Cohen, *supra,* at 26; Ireland, *Entire Case Removal Under 1441(c),* 11 Indiana L.Rev. 555, 571 (1978).

By understanding § 1441(c)'s history—its focus on the diversity case and its goal of restricting removal—one can understand the Supreme Court's decision in *American Fire & Casualty Co. v. Finn, supra. Finn*

was a diversity case, and the Supreme Court there interpreted the words "separate and independent claim or cause of action" strictly, as the statute's framers intended, to limit removal. 341 U.S. at 12, 71 S.Ct. at 539. Thus, the Court held that

> where there is a single wrong to plaintiff, for which relief is sought, arising from an interlocked series of transactions, there is no separate and independent claim or cause of action under § 1441(c).

341 U.S. at 14, 71 S.Ct. at 540. *See New England Concrete Pipe Corp. v. D/C Systems of New England, Inc.,* 658 F.2d 867 (1st Cir.1981).

In the present case, the state claim against the individuals was based upon "an interlocked series of transactions," some of which were used to infer the federal claim. Plaintiffs' complaint alleged injuries arising out of a single, protracted strike, in which mass picketing and violence affected both Bonanno and third persons. Judging from the complaint, some of the individual instances of picketing and violence affected third parties within the scope of the Taft-Hartley Act. The "Taft-Hartley" instances comprise a portion of the "state law" instances; and all instances are connected and intertwined. The "claim or cause of action" against the individuals thus fails to meet the "separate and independent" test of *Finn, see* 341 U.S. at 16, 71 S.Ct. at 541, for both claims "substantially derive from the same facts." *New England Concrete Pipe Corp. v. D/C Systems of New England,* 658 F.2d at 874 n. 12. *Cf. McMahon Chevrolet, Inc. v. Davis,* 392 F.Supp. 322, 324 (S.D.Tex.1975).

In sum, *Aldinger* closes the door to these "pendent party" claims, and § 1441(c) fails to reopen it. We have what the commentators consider an anomalous "middle" category of parties left behind in state court. But we see no serious harm arising out of this interpretation of the law. To interpret the words "separate and independent" more liberally here would depart from *Finn,* suggest a different interpretation of these same words in "arising under" cases, and

thereby proliferate standards in an area already too complex. Any anomaly arising out of the much-criticized § 1441(c) can be resolved through legislation. The American Law Institute has suggested statutory revisions, including one which would require the district court to remand all claims not within its pendent jurisdiction, effectively eliminating the use of § 1441(c) in federal question cases of this sort. *See ALI Study of the Division of Jurisdiction Between State and Federal Courts,* 29, 212–13 (1969).

Since this court lacks jurisdiction over the claims against the individual defendants, the district court's decision on this point must be reversed. The proper statutory basis for removal of the claims against the Local is § 1441(b), which, given *Aldinger,* does not allow the pendent parties here to tag along.

█ We note one final, related jurisdictional matter in respect to § 1441(b). That section allows removal of "any *civil action*" of which the district courts have original jurisdiction. The previous version of the statute referred to "any *suit* of a civil nature," *Alabama Great So. Ry. Co. v. American Cotton Co.,* 229 F. 11, 15 (5th Cir.1916), and each cause of action was considered a separate suit. *Tillman v. Russo-Asiatic Bank,* 51 F.2d 1023 (2d Cir.1931), *cert. denied,* 285 U.S. 539, 52 S.Ct. 312, 76 L.Ed. 932 (1932). One commentator has argued that the term "civil action" means the *whole* state proceeding, so that if *some* claims or parties are not removable, *none* are. Lewin, *supra,* at 426. However, this is inconsistent with the well-established rule that the removal statute embraces the same "class of cases" as does the original jurisdiction statute. *Tennessee v. Union & Planters Bank,* 152 U.S. 454, 14 S.Ct. 654, 38 L.Ed. 511 (1894); *see Brough v. United Steelworkers of America,* 437 F.2d 748 (1st Cir.1971). Moreover, before 1948, the "arising under" defendant was allowed to remove his "suit," leaving other defendants behind, if necessary. *See, e.g., The Pacific Railroad Removal Cases,* 115 U.S. 1, 22–23, 5 S.Ct. 1113, 1123–24, 29 L.Ed. 319 (1885); *Galveston, Harrisburg & San Antonio Ry.*

*Co. v. Hall,* 70 F.2d 608 (5th Cir.1934). The Reviser nowhere suggested an intent to change this result. Rather, the Reviser's Note indicates that the change in terminology was meant to be cosmetic; Moore concludes that no change in substance was intended. 1A J. Moore, *supra,* at ¶ 157[4.–1]. We conclude that it is proper here for the Local to remove Bonanno's "arising under" and pendent claims against it to federal court, even if the other state claim defendants must be left behind.

The claims against the individual defendants must be remanded to the state court from which they came. *American Fire & Casualty Co. v. Finn,* 341 U.S. at 18–19, 71 S.Ct. at 542–43.

## IV

We can deal with the Local's remaining contentions more briefly.

1. The Local attacks the district court's decision as contrary to Norris-LaGuardia Act § 6, which forbids holding it responsible for the tortious acts of its "officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." 29 U.S.C. § 106. *See United Mine Workers v. Gibbs,* 383 U.S. at 737, 86 S.Ct. at 1144; *United Bhd. of Carpenters v. United States,* 330 U.S. 395, 403, 67 S.Ct. 775, 779, 91 L.Ed. 973 (1947). Here, however, the district court could find that the "clear proof" standard was satisfied.

█ There is sufficient evidence that the union's representative, Salter, participated in the threats and acts of violence. When the plaintiffs first requested an injunction, Salter promised the court he would control the pickets, and no injunction was issued. He then failed to deliver on this promise, and the court entered a restraining order. The district court reasonably found that Salter's failure was "deliberate." He had the power and authority to control the violence, but he never removed any picket from the line, nor did he ask the Local to impose any fines. (Other evidence indicates

that the Local's president knew of the allegations of violence as well.)

The Local argues that Section 6 of the Norris-LaGuardia Act requires a showing that *top* union officials approved the violence. But both the Supreme Court and other lower courts have based liability on the actions of officials comparable in rank to Salter. *United Mine Workers v. Gibbs,* 383 U.S. at 738, 86 S.Ct. at 1145 ("the U.M.W. representative"); *Kayser-Roth Corp. v. Textile Workers of America,* 479 F.2d 524, 527 (6th Cir.) (the "strike supervisors"), *cert. denied,* 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973); *see Ritchie v. United Mine Workers,* 410 F.2d 827 (6th Cir.1969) (examining circumstantial evidence of involvement by union members). The Local adds that there is no evidence that it approved of *illegal* action. But, the Supreme Court has held that the union need do no more than authorize an agent's general activity. For example, "[t]he grant of authority to an officer of a union to negotiate agreements with employers . . . may well be sufficient to make the union liable." *United Bhd. of Carpenters v. United States,* 330 U.S. at 410, 67 S.Ct. at 783.

In sum, on the facts present here the district court could reasonably find "knowing tolerance" by the union, *Gibbs,* 383 U.S. at 739, 86 S.Ct. at 1145–46, if not actual authorization, *see Gibbs,* 383 U.S. at 738, 86 S.Ct. at 1145; *Kayser-Roth,* 479 F.2d at 526–27, and it could, therefore, hold the Local liable for the acts of its members.

■ 2. The Local argues that Bonanno should not have been allowed to recover the costs of protective services for 1976. It claims, first, that Bonanno's fear of violence in 1976 was unreasonable. The record, however, shows many instances of violence before 1976, and at least eight instances during that year; it provides adequate support for the award.

The Local adds that any danger was Bonanno's fault, for Bonanno refused to ratify the bargaining agreement that all other linen companies accepted in April, 1976. Whether or not Bonanno was within its legal rights in refusing to ratify, however,

striker violence is not justified. *NLRB v. Fansteel Metallurgical Corp.,* 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939).

■ Finally, the Union claims that Bonanno cannot recover for the expense of putting armed guards on its delivery trucks, for Massachusetts law prohibits "licensees" from "furnish[ing] armed guards upon the highways for persons involved in labor disputes." Mass.Gen.Laws ch. 147, § 30(8). In Massachusetts, however, a "violation of law is a bar to recovery . . . only in instances where it is a contributing cause to the injury." *Janusis v. Long,* 284 Mass. 403, 410, 188 N.E. 228 (1933); *see Wallace v. Patey,* 335 Mass. 220, 222, 139 N.E.2d 407 (1957). Assuming a "violation of law" for the sake of argument, we still see no relation between the "illegality" and the expense. Bonanno had to pay for the guards, not their weapons.

3. The Union claims that the district court erred in awarding prejudgment interest (under Mass.Gen.Laws ch. 231, § 6B) for damages which accrued after the action was filed, citing *Jet Spray Cooler, Inc. v. Crampton,* 377 Mass. 159, 182 n. 21, 385 N.E.2d 1349, 1362 n. 21 (1979).

■ Subsequent Supreme Judicial Court cases, however, have made clear that the court is to "add interest on the entire amount of the verdict." *Griffin v. General Motors Corp.,* 380 Mass. 362, 403 N.E.2d 402, 406 (1980); *Carey v. General Motors Corp.,* 377 Mass. 736, 387 N.E.2d 583, 588–89 (1979). Section 6B establishes a simple, mechanical rule: rather than calculating the appropriate sum of interest for each part of an award, where the damages may have accrued on any number of different dates, the clerk of court simply adds to the court's total award "interest thereon . . . from the date of the commencement of the action . . . ." We think the district court correctly applied this rule.

*The judgment of the district court against the defendant Teamsters Union is affirmed; the district court's denial of the motion of defendants Forrest, Halloran, and Salter is reversed; and the court is instruct-*

*ed to vacate the judgment against them and to remand the case to the Superior Court of Suffolk County, Massachusetts.*